RYAN E. HATCH
California Bar No. 235577
ryan@ryanehatch.com
Law Office of Ryan E. Hatch, P.C.
13323 Washington Blvd., Suite 100
Los Angeles, CA 90066
Telephone: 310-279-5076

DAVID A. SKEELS (*admitted pro hac vice*)
Texas Bar No. 24041925
dskeels@whitakerchalk.com
ENRIQUE SANCHEZ, JR. (*admitted pro hac vice*)
Texas Bar No. 24068961
rsanchez@whitakerchalk.com
WHITAKER CHALK SWINDLE & SCHWARTZ PLLC
301 Commerce Street, Suite 3500
Fort Worth, Texas 76102
Telephone: 817-878-0500
Facsimile: 817-878-0501

CABRACH J. CONNOR (*admitted pro hac vice*)
Texas Bar No. 24036390
cab@connorkudlaclee.com
JENNIFER TATUM LEE (*admitted pro hac vice*)
Texas Bar No. 24046950
jennifer@connorkudlaclee.com
KEVIN S. KUDLAC (*admitted pro hac vice*)
Texas Bar No. 00790089
kevin@connorkudlaclee.com
CONNOR KUDLAC LEE PLLC
609 Castle Ridge Road, Suite 450
Austin, Texas 78746
Telephone: 512-777-1254
Facsimile: 888-387-1134

Attorneys for PINN, Inc.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PINN, INC.,<br><br>                Plaintiff,<br><br>   v.<br><br>APPLE INC.,<br><br>                Defendant. | **Lead Case No. 8:19-cv-1805-DOC-JDE**<br><br>**SECOND AMENDED COMPLAINT FOR PATENT INFRINGEMENT AGAINST APPLE INC.**<br><br>**DEMAND FOR JURY TRIAL**<br><br>District Judge: David O. Carter<br>Magistrate Judge: John D. Early<br>Technical Special Master: David Keyzer |

| | |
|---|---|
| PINN, INC.,<br>                    Plaintiff,<br><br>v.<br><br>GOOGLE LLC,<br>                    Defendant. | CASE NO. 8:19-cv-1840-DOC-JDE<br>CONSOLIDATED CASE |
| PINN, INC.,<br>                    Plaintiff,<br><br>     v.<br><br>SAMSUNG ELECTRONICS<br>AMERICA, INC.,<br>                    Defendant. | CASE NO. 8:19-cv-1856-DOC-JDE<br>CONSOLIDATED CASE |

Pinn, Inc. files this Second Amended Complaint against Apple, Inc. for infringement of U.S. Patent Nos. 9,807,491 (the "'491 Patent"), 10,455,066 (the "'066 Patent"), and 10,609,198 (the "'198 Patent").

## PARTIES

1.    Pinn, Inc. ("Pinn" or "Plaintiff") is a California Corporation with its headquarters and principal place of business at 2522 Chambers Rd., Suite 100, Tustin, CA 92780.

2.    Defendant Apple Inc. ("Apple" or "Defendant") is a corporation incorporated under the laws of California with its principal place of business at 1 Apple Park Way, Cupertino, California 95014.

3.    Apple has previously appeared and may be served through its counsel of record. Alternatively, Apple may be served through its registered agent: CT Corporation System, 818 West Seventh Street, Suite 930, Los Angeles, California 90017.

## JURISDICTION AND VENUE

4.    Pinn brings this action for patent infringement under the patent laws of the United States, including 35 U.S.C. §§ 154, 271, 281, and 283-285.  This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

5.    Apple is subject to the general and specific personal jurisdiction of this

Court, based upon its regularly conducted business in the State of California and in the Central District of California ("District"), including conduct giving rise to this action.

6.      Apple conducts business and has committed, and continues to commit, acts of direct and indirect infringement in California, within this District, and throughout the United States, by, among other things, making, using, selling, or offering for sale in the United States, and/or importing into the United States, electronic devices and systems with wireless earbuds that embody one or more of the inventions claimed in the '491, '066, and '198 Patents.

7.      Apple maintains regular and established places of business in this district, where it promotes, sells, offers for sale, uses, provides technical support for, develops, and demonstrates infringing products, including the Apple offices in Culver City and retail stores in Brea, Cerritos, Costa Mesa, Glendale, Los Angeles, Manhattan Beach, Mission Viejo, Newport Beach, Palm Desert, Pasadena, Rancho Cucamonga, San Luis Obispo, Santa Barbara, Santa Monica, and Thousand Oaks.

8.      Apple sells infringing devices and systems and provides customer service and technical support to retailers, customers, and other end users in this district.

9.      Apple has established sufficient contacts with this forum such that the exercise of jurisdiction over Defendant comports with traditional notions of fair play and substantial justice.

10.      Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1400(b).

11.      In other patent infringement matters, Apple has admitted that it maintains a regular and established place of business, and that venue is proper, in this District. *See, e.g.*, *Limestone Memory Sys. LLC v. Defendant, Inc.*, Case No. 8:15-cv-01274 (C.D. Cal.) (Dkt. 27, ¶ 6); *Data Scape Ltd. v. Defendant Inc.*, Case No. 2:18-cv-10659 (C.D. Cal.) (Dkt. 18, ¶ 5).

# THE PINN PATENTS

12.     Defendant has infringed and continues to infringe one or more claims of Pinn's '491, '066, and '198 Patents.  The '491, '066, and '198 Patents may be referred to as the Patents in Suit or, collectively, the Asserted Patents.

13.     Generally speaking, the Asserted Patents claim methods, apparatuses, and systems relating to a personal wireless media station having a wireless earbud and main body, wherein the wireless earbud is capable of pairing with a device, such as a smartphone, to receive and play audio data, and capable of connecting to an electric circuit in the main body, for wired communication with the main body when plugged into a connection hole of the main body.

14.     Pinn is the assignee of all right, title, and interest in and to each of the Asserted Patents and has the exclusive right to assert all causes of action arising under, or that may arise under, the Asserted Patents, including the right to pursue and recover any and all monetary and equitable remedies for infringement.

## The '491 Patent: "Electronic Device with Wireless Earbud"

15.     On October 31, 2017, the United States Patent and Trademark Office ("USPTO") issued the '491 Patent following a full examination of U.S. Pat. App. Ser. No. 15/625,935, which was filed October 2, 2017, and claims priority to PCT App. No. PCT/US2016/025936 (filed on April 4, 2016) and U.S. Prov. App. No. 62/142,978 (filed April 3, 2015).

16.     Exhibit A is a true and correct copy of the '491 Patent.

17.     The '491 Patent describes a personal wireless media station that includes a main body and wireless earbud.

18.     In reference to one disclosed embodiment, the '491 Patent describes an apparatus comprising a main body, a wireless earbud configured for plugging into a connection hole of the main body to form a single integrated body, a user input button, at least one processor, and at least one memory.

19.     Claim 1 of the '491 Patent recites:

1. An apparatus comprising:

a main body comprising a connection hole, a user input button, at least one processor and at least one memory; and

a wireless earbud configured for plugging into the connection hole of the main body to form a single integrated body with the main body,

wherein the wireless earbud has wireless communication capability for wirelessly pairing with a smartphone and is configured to receive audio data from the smartphone and to play audio using the audio data from the smartphone when wirelessly paired with the smartphone,

wherein in addition to wireless communication capability for wireless pairing with the smartphone, the wireless earbud comprises an earbud connector for connecting with an electric circuit of the main body for wired communication capability with the main body when plugged into the connection hole,

wherein, when wireless earbud is plugged into the connection hole, the wireless earbud is configured to perform wired two-way data communication with the main body,

wherein the at least one processor of the main body is configured to execute computer program instructions stored in the at least one memory

for initiating the wireless pairing with the smartphone in response to pressing of the user input button provided on the main body,

for initiating battery charging of the wireless earbud in response to the wireless earbud's plugging into the connection hole, and

for turning off the wireless pairing with the smartphone when the wireless earbud is being charged.

20.     Figure 2 illustrates certain exemplary uses of an embodiment of the '491 Patent:



21.     The technologies and innovations recited in the claims of the '491 Patent, including Claim 1, provide inventive concepts and do not claim an abstract idea.  The individual elements of the claims of the '491 Patent are not well-understood, routine, or conventional. Instead, the claims of the '491 Patent are directed to unconventional, inventive concepts that implement technical solutions to solve various problems, including problems unique to wireless earbud pairing, and that enhance the operation and functionality of wireless earbuds.  As one example, the '491 Patent provides a technical solution that eliminates the need to have unobstructed access to a smartphone's inputs and outputs and facilitates pairing between the smartphone and the wireless earbud.  *See, e.g.*, '491 Patent at 1:14-26.

22.     The technological solutions taught by the '491 Patent provide advantages over, and improvements to, the state of the art at the time. For example, the teachings of the '491 Patent improve the performance of a wireless earbud system by simplifying the pairing process and by providing a mechanism for charging wireless earbuds when away from a traditional power source.

23.     The inventions and the limitations recited in the claims of the '491 Patent, whether alone or in combination with other limitations, embody a number of inventive concepts. For example, claim 1 of the '491 Patent describes a consumer product or system featuring distributed intelligence and that features an earbud that communicates wirelessly with a smartphone and communicates via wired two-way communication with the main body.  The main body is configured to initiate wireless pairing with a smartphone when a user presses the input button on the main body. When plugged into the connection holes, the wireless earbuds are configured such that the earbud batteries are charged by the main body and perform two-way data communication with the main body. *See, e.g.*, '491 Patent at 1:45-49.

**The '066 Patent: "Mobile System with Wireless Earbud"**

24.     On October 22, 2019, the USPTO issued the '066 Patent following a full examination of U.S. Pat. App. Ser. No. 15/563,937, which was filed October 2, 2017, and claims priority to PCT App. No. PCT/US2016/025936 (filed April 4, 2016) and U.S. Prov. App. Nos. 62/199,943 (filed July 31, 2015) and 62/142,978 (filed April 3, 2015).

25.     The USPTO published the '937 App. on May 10, 2018.

26.     Since May 10, 2018, all papers in the '937 App. file have been available to the public.

27.     On August 28, 2019, the USPTO allowed claims 23-60 of the '937 App. (sometimes referred to as the "'937 App. Published Claims," as shown in Exhibit B).

28.     On September 3, 2019, Pinn paid the issue fee.

29.     On October 22, 2019, the '066 Patent issued from the '937 App. with claims substantially identical to the '937 App. Published Claims listed in Exhibit B.

30.     Exhibit D is a true and correct copy of the '066 Patent.

31.     Original claim 23 of the '937 App. (final claim 1 in the '066 Patent) recites:

A mobile system comprising:

a base station comprising a connection hole, a user input button, at least one processor, at least one memory, and circuitry; and

a wireless earbud configured for plugging into the connection hole of the base station to form an integrated body with the base station,

wherein the system is capable of wirelessly pairing with a smartphone for the wireless earbud to receive audio data originated from the smartphone,

wherein, in response to pressing of the user input button, the at least one processor is configured to execute computer program instructions stored in the at least one memory to initiate processing for the wireless pairing with the smartphone such that the wireless earbud receives audio data originated from the smartphone and plays audio using the audio data from the smartphone,

wherein, in response to plugging the wireless earbud into the connection hole, the at least one processor is configured to execute computer program instructions stored in the at least one memory to initiate charging of a battery of the wireless earbud,

wherein, when the wireless earbud is plugged into the connection hole of the base station, the wireless earbud is configured to electrically connect with the circuitry of the base station and further configured to performing wired data communication with the base station.

*See, e.g.*, Ex. B, Claim 23 (Ex. D, Claim 1).

32.    The particular combination of elements in claim 23 of the '937 App. (Claim 1 of the '066 Patent) was not well-understood, routine, or conventional to persons of skill in the art at the time of the invention. Instead, the '066 Patent, including Claim 1, is directed to unconventional, inventive concepts disclosed in the specification.

33.    Whether alone or in combination with other limitations, the claimed inventions and limitations recited in the '066 Patent embody a number of inventive concepts. Claim 1, for example, describes, among other things, a mobile system that

has distributed intelligence and that enables wireless pairing of an earbud and smartphone in response to pressing a user input button and a base station featuring a connection hole into which an earbud is plugged for charging and wired data communication.

34. For example, in one embodiment described in claim 21 of the '066 Patent, "the at least one processor is configured to execute computer program instructions stored in the at least one memory to turn off the wireless pairing while the wireless earbud is being charged."

35. As illustrated in Figure 1 (excerpted below), the earbud connector of the wireless earbud is mateable with the main body connector of the main body. The specification further describes: "The wireless earbud and the main body form a single integrated body when the earbud connector and the main body connector are connected with each other."



**U.S. Pat. No. 10, 609,198:**
**"Personal Media System Including Base Station and Wireless Earbud"**

36. Mr. Kim filed U.S. Patent Application No. 15/694,736 (the "'736 App.") on September 1, 2017, as a continuation of U.S. Pat. App. Ser. No. 15/625,935 (filed June 16, 2017), which is a continuation of PCT App. No. PCT/US2016/025936 (filed April 4, 2016), claiming priority to U.S. Prov. App. No. 62/142,978.

37. The USPTO published the '736 App. on December 28, 2017.

38.    Since December 28, 2017, all papers in the '736 App. file have been available to the public.

39.    On June 19, 2019, the USPTO allowed claims 1-29 of the '736 App. (sometimes referred to as the "'736 App. Published Claims," as shown in Exhibit C).

40.    On January 4, 2020, after a request for continued examination, the USPTO again provided its "Reasons for Allowance" with respect to the '736 App. On January 29, 2020, Pinn received a Notice of Allowance for the '736 App. On February 12, 2020, Pinn paid the issue fee. On March 11, 2020, the USPTO mailed an "Issue Notification," which, for the first time, assigned a patent number to the '736 App. and specified an issue date of March 31, 2020.

41.    On March 31, 2020, the '198 Patent issued with claims substantially identical to the claims previously disclosed to Apple. Exhibit C is also a true and correct copy of the '198 Patent.

42.    Claim 1 of the '198 Patent recites:

> A mobile system comprising:
>     a mobile base station comprising a connection hole, a user input button, at least one processor, at least one memory, and circuitry; and
>     a wireless earbud configured for plugging into the connection hole of the mobile bases station to form an integrated body with the mobile base station,
>     wherein, while the wireless earbud in plugged in the connection hole of the mobile base station, the wireless earbud is configured to electrically connect with the circuitry of the mobile base station and further configured to perform wired data communication with the mobile base station,
>     wherein, while the wireless earbud is plugged in the connection hole of the mobile base station, the circuitry of the mobile base station is configured to obtain characteristics of the wireless earbud and send the characteristics to the at least one processor,
>     wherein, while the wireless earbud is plugged in the connection hole of the mobile base station, the at least

one processor is configured to execute computer program instructions stored in the at least one memory to initiate charging of a battery of the wireless earbud,

wherein the wireless earbud has wireless communication for wireless pairing with a smartphone to perform data communication with the smartphone,

wherein the mobile system is configured to generate sound when a mobile application installed on the smartphone is searching for the mobile system while the wireless earbud is paired with the smartphone,

wherein, in response to pressing of the user input button of the mobile base station, the at least one processor is configured to execute computer program instructions stored in the at least one memory to initiate processing for the wireless pairing,

wherein the wireless earbud is not capable of wirelessly sending data to the mobile base station.

43.    The particular combination of elements recited in claim 1 of the '198 Patent was not well-understood, routine, or conventional to persons of skill in the art at the time of the invention.  Instead, the claimed subject matter is directed to unconventional, inventive concepts disclosed in the specification.

44.    Whether alone or in combination with other limitations, the claimed inventions and limitations recited in the '198 Patent embody a number of inventive concepts. Claim 1, for example, describes, among other things, a mobile system featuring distributed intelligence, that enables wireless pairing of an earbud and smartphone to perform data communication with the smartphone, and enables emission of sound when a mobile application installed on the smartphone is searching for the mobile system while the earbud is paired.

45.    The specification of the '198 Patent describes at least one embodiment that features an application for finding a personal wireless media station within the station's communication range and for monitoring and controlling various features of the personal wireless media station, such as battery level.

46.    In at least one embodiment of the device finder, Pinn Finder beeps and

blinks when the mobile app is searching for the Pinn device.

47.    Pinn previously provided notice of the '198 Patent, including the claims of the'198 Patent. Pinn's notice made clear that Pinn would amend its complaint to allege infringement of the patent issued from the '736 App., i.e., the '198 Patent.

## PINN, INC.



48.    Pinn was founded by Seung Jin ("Sean") Kim in 2015, with a vision toward designing and developing wearable technology that enhances the smartphone experience and eliminates frustrating phone problems like trying to locate and retrieve your phone quickly to answer an incoming call.

49.    Pinn is headquartered, and Mr. Kim resides, in Irvine, California.

50.    Pinn's product inventory, company files, and documents relating to the Patents in Suit and claims in this lawsuit are located in Irvine.

51.    Sean Kim received a bachelor's degree in Music Composition and Orchestra Conduction from Seoul National University in 2003. In addition to being an accomplished composer, Mr. Kim is an entrepreneur and inventor.

52.    While serving as an IP and business consultant to Deca International Corporation, Mr. Kim developed and helped Deca commercialize a variety of GPS-based golf rangefinders, voice-based products, and laser-based rangefinders.

53.    After Deca, Mr. Kim worked with AQ Corporation, a mobile nearfield communication company. He assisted AQ in developing its intellectual property assets and helped direct AQ's research and development efforts.  While at AQ, Mr. Kim worked on the design of an interactive, event-specific digital signage platform for use on mobile devices, called Anniver.

54.    Recognizing the need for a personal media system with simplified



operation and structure, Mr. Kim conceived of the Pinn device in 2014 and founded Pinn Inc. the following year to develop a first-generation wearable product that would provide consumers with an easier way to use their smartphones, by simplifying and enhancing the wireless capabilities and operation of the device.  Mr. Kim recognized that a system having distributed intelligence and processing, along with an integrated modular design, would improve ease of use and functionality.

55.    The USPTO recognized Mr. Kim's innovations by granting the first of his Pinn patents, the '491 Patent, in 2017.

56.    Pinn proved Mr. Kim's concept in October 2015 and successfully launched the Pinn product soon after.  Pinn became available to the public in 2017.

57.    Pinn includes a wireless earbud that is docked and integrated into the Pinn clip or main body.

58.    Pinn wirelessly connects to a user's smartphone via Bluetooth.



## APPLE AIRPODS WIRELESS MEDIA SYSTEM

59.     Apple makes, has made, uses, sells, and offers for sale in the United States and imports into the United States various versions of a wireless media system that practice the Pinn Patents in Suit: Apple AirPods 1st Gen., AirPods 2nd Gen., and Powerbeats Pro.





60.    Apple started selling the first generation AirPods in or around December 2016.

61.    Apple started selling the second generation AirPods in or around March of 2019.

62.    In normal operation, AirPods connect via Bluetooth to Apple's iPhone or Apple Watch products, and "sound switches seamlessly between the devices." *See* www.apple.com/airpods/.



63.     To use Apple AirPods, Apple encourages users to use a compatible Apple device:





https://support.apple.com/en-us/HT207010

64.     Apple AirPods include a charging case that features a connection hole for each earbud.



65.    When AirPod earbuds are plugged in a connection hole of the base station, they form an integrated body with the case.



66.    In normal charging operation, the AirPod earbuds connect via electrical connector to an electric circuit in the main body of the case and receive a charging signal.

67.    Electrical contacts for charging the AirPod earbuds are located in the connection hole for each earbud.



68.     The Apple AirPod case main body features a user input button.



69.     The main body of the Apple AirPod case comprises at least one processor and at least one memory.



70.     At least one processor of the AirPod main body executes instructions for initiating Bluetooth pairing in response to pressing the user input button.

71.     At least one processor of the AirPod main body executes instructions for initiating battery charging of the wireless earbuds when placed in the connection hole and for turning off Bluetooth pairing when an earbud is being charged.

72.     In normal operation, when paired wirelessly to a smartphone (e.g., an iPhone or Apple Watch), Apple AirPods receive audio data from the smartphone and play audio using the audio data from the smartphone.

73.     The main body of the Apple AirPod case comprises at least three integrated circuits: an MCU with memory and connectivity, a charging IC, and a power management IC.



74.     Apple's AirPods are configured to perform wired two-way data communication with the charging case.

## Check the charge status

You can check the charge status of your AirPods with charging case with your iPhone, iPad, iPod touch, or Mac.

### On your iOS device





On your iPhone, open your case lid with your AirPods inside and hold your case close to your device. Wait a few seconds to see the charge status of your AirPods with charging case.

You can also check the charge status of your AirPods with charging case with the Batteries widget on your iOS device. The charge for your case appears only when at least one AirPod is in the case.

75.    Apple AirPods are configured to provide battery status to a smartphone for display on a mobile application of the smartphone.

## Check the charge status

You can check the charge status of your AirPods with charging case with your iPhone, iPad, iPod touch, or Mac.

## On your iOS device





On your iPhone, open your case lid with your AirPods inside and hold your case close to your device. Wait a few seconds to see the charge status of your AirPods with charging case.

You can also check the charge status of your AirPods with charging case with the Batteries widget on your iOS device. The charge for your case appears only when at least one AirPod is in the case.

https://support.apple.com/en-us/HT207012

76.    Mobile applications on an iPhone or other compatible smartphone may be used to control AirPod functions. For example, a user may use the Siri mobile assistant application to adjust volume.

## Control your device

You can use your AirPods to use Siri and control the playback of audio content.

With AirPods (2nd generation), by default, you use Siri by saying "Hey Siri". And when you double-tap an AirPod, you either play audio or skip forward.

With AirPods (1st generation), by default, you double-tap to use Siri.

Regardless of which model of AirPods you have, you can set each AirPod to do one of these when you double-tap it:



- Use Siri[3]
- Play and pause your audio content
- Skip to the next track
- Go back to the previous track
- Turn off your audio content

Learn how to choose what you want each AirPod to do when you double-tap it.

## Use Siri

With AirPods (2nd generation), you can say "Hey Siri" or double-tap to use Siri. With AirPods (1st generation), double-tap to use Siri.

You can use Siri with your AirPods to ask questions and make phone calls. Siri can also control your music and check on your AirPods. Here are some examples of Siri requests:

- "Play my Favorites playlist."
- "Turn up the volume."
- "How do I get home from here?"
- "Skip to the next song."
- "Pause music."
- "How is the battery on my AirPods?"

Find more Siri examples.

https://support.apple.com/en-us/HT207010

77.   AirPod earbuds do not pair with the charging case.

78.   AirPod earbuds are incapable of wirelessly communicating with the mobile base station.

79.   Apple sells AirPods with a mobile base station that includes a connection hole, a user input button, at least one processor, at least one memory, and circuitry. The AirPod system is designed and intended to be used by plugging the earbuds into connection holes of the base station for charging and two-way wired data communication.

80.   At least one processor in the AirPod base station controls shut down and charging of the earbuds when they are plugged in the connection holes.

## Charge your AirPods and case

To charge your AirPods, put them in the case and close the lid.[4] AirPods shut down and charge whenever they're in the case.

You can charge your AirPods (1st or 2nd generation) in the Wireless Charging Case or AirPods Charging Case. If you have the Wireless Charging Case, you can charge wirelessly with a Qi-compatible charger. You can charge either case by plugging it in to an Apple Lightning to USB cable.

Learn more about charging.

https://support.apple.com/en-us/HT207010

81.   Apple's Find My AirPods feature provides the option to play a sound from the AirPod earbuds to locate an earbud.

## NOTICE

82.   In October 2016, on behalf of Pinn, Mr. Kim contacted Apple by e-mail and provided information about Pinn, its technology, and the inventions claimed in the Patents in Suit.

83.   In emails to Adrian Perica and Tim Cook, Mr. Kim provided details about Pinn, Inc., a link to Pinn's website, and documentation about the Pinn.

84.   On October 22, 2017, Mr. Perica responded by stating, "Thanks for reaching out, but this is a pass for us."

85.     Mr. Kim provided a list of Pinn's intellectual property assets at the time and specifically identified the pending application from which the '491 Patent issued:



86.     Apple has been aware of Pinn's '491 Patent since at least the date it was cited during prosecution of Apple's later-filed patent applications. For example, Apple's U.S. Patent No. 10,042,595 references the '491 Patent:



87.     Apple's U.S. Patent No. 10,042,595 relates to the Apple AirPods.

88.     Pinn has complied with 35 U.S.C. § 287.

**COUNT I: DIRECT INFRINGEMENT OF U.S. PATENT NO. 9,807,491**

89.     Pinn realleges and incorporates by reference the allegations set forth in the preceding paragraphs as if set forth here in full.

90.     As the owner of the '491 Patent, Pinn holds all substantial rights in and to the '491 Patent, including the right to exclude others from practicing its patented inventions, the right to enforce the '491 Patent, and the right to sue and recover damages for infringement of the '491 Patent.

91.     Apple has no authority or license to practice the inventions claimed in the '491 Patent.

92.     The '491 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code after a full and fair examination by the USPTO.

93.     Apple has infringed and continues to infringe the claims charted in Pinn's Preliminary Infringement Contentions  for the '491 Patent (claims 1, 9 and 10)[1] by, among other things, making, using, selling, and offering for sale in the United States, and/or importing into the United States – without license or authority – products, devices, or systems, including Apple AirPods and Powerbeats Pro wireless earbuds (the "Accused Products") that fall within the scope of one or more claims of the '491 Patent, in violation of at least 35 U.S.C. § 271(a).

94.     Apple's infringing conduct has been, and continues to be, willful, intentional, and carried out with actual knowledge of the '491 Patent.

95.     Since receiving notice of the '491 Patent, Apple has continued to perform acts of infringement and has taken no steps to modify the Accused Products or to instruct end users and customers how to use the Accused Products in a way that avoids infringement.

96.     As a result of Apple's past infringing conduct, Apple is liable to Pinn in

---

[1] Pinn's Preliminary Infringement Contentions and any amendments ("PICs") identify Apple's Accused Products and the Asserted Claims Apple infringes.

an amount that adequately compensates it for Apple's infringement, which, by law, can be no less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

97.    As a result of Apple's ongoing infringing conduct described in this Count, Pinn will continue to be damaged unless Apple is enjoined from further infringement.

**COUNT 2: INDIRECT INFRINGEMENT OF U.S. PATENT NO. 9,807,491**

98.    Plaintiff realleges and incorporates by reference the factual allegations set forth in the preceding paragraphs as if set forth here in full.

99.    Apple is liable for indirect infringement of the claims charted in Pinn's Preliminary Infringement Contentions  for the '491 Patent (claims 1, 9 and 10) by knowingly encouraging, aiding, and directing others (e.g., end users and customers) to use and operate the Accused Products in an infringing manner and to perform the

 

claimed methods of the '491 Patent.

100.   Apple has actual knowledge of Pinn's '491 Patent and has been and is on notice of the '491 Patent, the Accused Products that infringe the '491 Patent, and the manner in which such products infringe.

101.   Apple encourages, directs, aids, and abets the use, assembly, configuration, and installation of the Accused Products, which have no substantial non-infringing uses.

102.   Apple specifically intends the Accused Products to be used and operated to infringe one or more claims of the '491 Patent.

103.   By providing manuals, advertising, instructional documentation and videos, and technical support (e.g., Apple Care), Apple encourages and instructs end users and customers to use and operate the Accused Products in an infringing manner.

104.   For example, despite having knowledge of the '491 Patent, Apple has provided, and continues to provide, instructional materials, such as user guides, owner manuals, and online resources (e.g., https://support.apple.com/en-us/HT207010) that teach and encourage customers and other end users to use the Accused Products in an infringing manner. Apple actively induces infringement of the '491 Patent.

105.   The Accused Products include hardware components and software instructions that operate in concert to perform specific, intended functions that constitute material parts of the inventions claimed in the '491 Patent and are not staple articles of commerce suitable for substantial non-infringing use.

106.   For example, the Accused Products include circuitry configured to operate in combination with software instructions to perform specific functions, such as pairing, playing audio data received from a smartphone, and initiating charging of wireless earbuds, claimed in the '491 Patent.  Such hardware and software have no substantial non-infringing use.

107.   Apple's infringing conduct has been and continues to be willful, intentional, and carried out with actual knowledge of the '491 Patent.

108.   Since receiving notice of the '491 Patent, Apple has continued to perform acts of indirect infringement and has taken no steps to modify the Accused Products or instruct end users or customers how to use the Accused Products in a way to avoid infringement.

109.   As a result of Apple's past infringing conduct, Apple is liable to Pinn in an amount that adequately compensates it for Apple's infringement, which by law can be no less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

110.   As a result of Apple's ongoing infringing conduct described in this Count, Pinn will continue to be damaged unless Apple is enjoined from further infringement.

## COUNT 3: DIRECT INFRINGEMENT OF U.S. PATENT NO. 10,455,066

111.   Pinn realleges and incorporates by reference the factual allegations set forth in the preceding paragraphs as if set forth here in full.

112.   As the owner of the '066 Patent, Pinn holds all substantial rights in and to the '066 Patent, including the right to exclude others from practicing its patented inventions, the right to enforce the '066 Patent, and the right to sue and recover damages for infringement of the '066 Patent, including past damages.

113.   The Patent Office published the '937 App. on May 10, 2018.

114.   The Patent Office allowed claims 23-60 of the '937 App. on August 28, 2019.

115.   The '066 Patent issued on October 22, 2019.

116.   Claims 23-60 of the '937 App. issued in a form substantially identical to those shown in Exhibit B.  *See* Exhibit D, '066 Patent.

117.   Apple has no authority or license to practice the inventions claimed in the '066 Patent.

118.   The '066 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code after a full and fair examination by the USPTO.

119.   Apple has infringed and continues to infringe the claims charted in Pinn's Preliminary Infringement Contentions for the '066 Patent (claims 1, 4, 6, 8, 9, 10, 14, 21, 26, 28, 30, 34, 36, and 38) by, among other things, making, using, selling,

and offering for sale in the United States, and/or importing in to the United States, products, devices, or systems including the Accused Products, that fall within the scope of the claims, in violation of at least 35 U.S.C. § 271(a).

120.   By way of example, the Accused Products feature a charging case that charges wireless earbuds via a wired connection in a connection hole, a user input button, at least one processor, and at least one memory.

 

121.   Each wireless earbud plugs in a connection hole to form an integrated body.

122.   In normal operation, the wireless earbuds of the Accused Products pair with a smartphone via Bluetooth, receive audio data from the smartphone (e.g., an Apple iPhone or Apple Watch), and play audio using the audio data from the iPhone or Apple Watch when paired wirelessly.

123.   The Accused Products feature an earbud connector for connecting with an electrical circuit of the main body for wired data communication.



124.  The Accused Products are configured such that they do not transmit data wirelessly between the AirPods and the base station charging case.

125.  Apple's Find My AirPods application runs on a smartphone (e.g., iPhone or Apple Watch), and the system is configured such that one or more of the wireless earbuds may emit sound while paired with the smartphone.

126.  Since receiving notice of the '066 Patent, Apple has continued to perform acts of indirect infringement and has taken no steps to modify the Accused Products or instruct end users or customers how to use the Accused Products in a way to avoid infringement.

127.  Apple's infringing conduct has been and continues to be willful, intentional, and carried out with actual knowledge of the '066 Patent.

128.    As a result of Apple's past infringing conduct, Apple is liable to Pinn in an amount that adequately compensates it for Apple's infringement, which, by law, can be no less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

129.    As a result of Apple's ongoing infringing conduct described in this Count, Pinn will continue to be damaged unless Apple is enjoined from further infringement.

**COUNT 4: INDIRECT INFRINGEMENT OF U.S. PATENT NO. 10,455,066**

130.    Plaintiff realleges and incorporates by reference the factual allegations set forth in the preceding paragraphs as if set forth here in full.

131.    Apple is liable for indirect infringement of the claims charted in Pinn's Preliminary Infringement Contentions for the '066 Patent (claims 1, 4, 6, 8, 9, 10, 14, 21, 26, 28, 30, 34, 36, and 38) since at least as early as the date of service of the Original Complaint, the First Amended Complaint, the patent issued or the publication date of the claims that issued from the '937 App., if not earlier, because it knowingly encourages, aids, and directs others (e.g., end users and customers) to use and operate the Accused Products in an infringing manner and to perform the claimed methods of the '066 Patent.

132.    Since at least as early as October 22, 2019, Apple has had knowledge of the '066 Patent and its claims.  Since that time, Apple has specifically intended, and continues to specifically intend, for persons who acquire and use the Accused Products, including Defendant's customers (e.g., individual users, etc.), to use such devices and systems in a manner that infringes the '066 Patent. This is evident when Apple encourages and instructs customers and other end users in the use and operation of the Accused Products, via advertisement, technical material, instructional material, instructional videos, or otherwise.

133.    The USPTO published the '937 App. on May 10, 2018.

134.    On August 28, 2019, the USPTO allowed claims 23-60 of the '937 App.

(sometimes referred to as the "'937 App. Published Claims," as shown in Exhibit B).

135.   Apple has actual knowledge of Pinn's '066 Patent and has been and is on notice of the '066 Patent, the Accused Products that infringe the claimed subject matter of the '066 Patent, and the manner in which such products infringe.

136.   Apple encourages, directs, aids, and abets the use, assembly, configuration, and installation of the Accused Products, which have no substantial non-infringing uses.

137.   Apple specifically intends the Accused Products to be used and operated to infringe one or more claims of the '066 Patent.

138.   By providing manuals, advertising, instructional documentation and videos, and technical support (e.g., Apple Care), Apple encourages and instructs end users and customers to use and operate the Accused Products in an infringing manner.

139.   For example, despite having knowledge of the '066 Patent, Apple has provided, and continues to provide, instructional materials, such as user guides, owner manuals, and online resources (e.g., https://support.apple.com/en-us/HT207010) that teach and encourage customers and other end users to use the Accused Products in an infringing manner. Apple actively induces infringement of the '066 Patent.

140.   The Accused Products include hardware components and software instructions that operate in concert to perform specific, intended functions that constitute material parts of the inventions claimed in the '066 Patent and are not staple articles of commerce suitable for substantial non-infringing use.

141.   Such hardware and software include a charging case comprising a connection hole, input button, processors, memory and circuitry, and a wireless earbud configured for plugging into the connection hole of the charging base to form an integrated body with the charging case.

142.   For example, the Accused Products include circuitry configured to operate in combination with software instructions to perform specific functions, such as pairing, playing audio data received from a smartphone, performing wired data

communication between the earbuds and base, and initiating charging of wireless earbuds, claimed in the '066 Patent. Such hardware and software have no substantial non-infringing use.

143.   Apple's infringing conduct has been and continues to be willful, intentional, and carried out with actual knowledge of the '066 Patent.

144.   Since receiving notice of the '066 Patent, Apple has continued to perform acts of indirect infringement and has taken no steps to modify the Accused Products or instruct end users or customers how to use the Accused Products in a way to avoid infringement.

145.   As a result of Apple's past infringing conduct, Apple is liable to Pinn in an amount that adequately compensates it for Apple's infringement, which by law can be no less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

146.   As a result of Apple's ongoing infringing conduct described in this Count, Pinn will continue to be damaged unless Apple is enjoined from further infringement.

## COUNT 5: DIRECT INFRINGEMENT OF U.S. PATENT NO. 10,609,198

147.   Pinn realleges and incorporates by reference the factual allegations set forth in the preceding paragraphs as if set forth here in full.

148.   As the owner of the '198 Patent, Pinn holds all substantial rights in and to the '198 Patent, including the right to exclude others from practicing its patented inventions, the right to enforce the '198 Patent, and the right to sue and recover damages for infringement of the '198 Patent, including past damages.

149.   The Patent Office published the '736 App. on December 28, 2017.

150.   The Patent Office allowed claims 1-29 of the '736 App. on June 19, 2019.

151.   The '198 Patent issued on March 31, 2020.

152.   Claims 1-29 of the '736 App. issued in a form substantially identical to

those shown in Exhibit C.  *See* Exhibit C, '198 Patent.

153.   Apple has no authority or license to practice the inventions claimed in the '198 Patent.

154.   The '198 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code after a full and fair examination by the USPTO.

155.   Apple has infringed and continues to infringe the claims charted in Pinn's Preliminary Infringement Contentions for the '198 Patent (claims 1, 3, 5, 9, 12, 15, 17, 19, 21, 25, 27 and 29) by, among other things, making, using, selling, and offering for sale in the United States, and/or importing in to the United States, products, devices, or systems, including the Accused Products, that fall within the scope of the claims in Pinn's Preliminary Infringement Contentions, in violation of at least 35 U.S.C. § 271(a).

156.   Since receiving notice of the '198 Patent, Apple has continued to perform acts of indirect infringement and has taken no steps to modify the Accused Products or to instruct end users or customers how to use the Accused Products in a way to avoid infringement.

157.   Apple's infringing conduct has been and continues to be willful, intentional, and carried out with actual knowledge of the '198 Patent.

158.   As a result of Apple's past infringing conduct, Apple is liable to Pinn in an amount that adequately compensates it for Apple's infringement, which, by law, can be no less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

159.   As a result of Apple's ongoing infringing conduct described in this Count, Pinn will continue to be damaged unless Apple is enjoined from further infringement.

**COUNT 6: INDIRECT INFRINGEMENT OF U.S. PATENT NO. 10,609,198**

160.   Plaintiff realleges and incorporates by reference the factual allegations

set forth in the preceding paragraphs as if set forth here in full.

161.   Apple is liable for indirect infringement charted in Pinn's Preliminary Infringement Contentions for the '198 Patent (claims 1, 3, 5, 9, 12, 15, 17, 19, 21, 25, 27 and 29) since at least as early as service of the Original Petition, the date the patent issued or the publication date of the claims that issued from the '736 App., if not earlier, because it knowingly encourages, aids, and directs others (e.g., end users and customers) to use and operate the Accused Products in an infringing manner and to perform the claimed methods of the '198 Patent.

162.   Since that time, Apple has specifically intended, and continues to specifically intend, for persons who acquire and use the Accused Products, including Defendant's customers (e.g., individual users, etc.), to use such devices and systems in a manner that infringes the '198 Patent. This is evident when Apple encourages and instructs customers and other end users in the use and operation of the Accused Products, via advertisement, technical material, instructional material, instructional videos, or otherwise.

163.   The USPTO published the '736 App. on December 28, 2017.

164.   On June 19, 2019, the USPTO allowed claims 1-29 of the '736 App. (sometimes referred to as the "'736 App. Published Claims," as shown in Exhibit C).

165.   Apple has actual knowledge of Pinn's '198 Patent and has been and is on notice of the '198 Patent, the Accused Products that infringe the claimed subject matter of the '198 Patent, and the manner in which such products infringe.

166.   Apple encourages, directs, aids, and abets the use, assembly, configuration, and installation of the Accused Products, which have no substantial non-infringing uses.

167.   Apple specifically intends the Accused Products to be used and operated to infringe one or more claims of the '198 Patent.

168.   By providing manuals, advertising, instructional documentation and videos, and technical support (e.g., Apple Care), Apple encourages and instructs end

users and customers to use and operate the Accused Products in an infringing manner.

169.   For example, despite having knowledge of the '198 Patent, Apple has provided, and continues to provide, instructional materials, such as user guides, owner manuals, and online resources (e.g., https://support.apple.com/en-us/HT207010) that teach and encourage customers and other end users to use the Accused Products in an infringing manner. Apple actively induces infringement of the '198 Patent.

170.   The Accused Products include hardware components and software instructions that operate in concert to perform specific, intended functions that constitute material parts of the inventions claimed in the '198 Patent and are not staple articles of commerce suitable for substantial non-infringing use.

171.   Such hardware and software include a charging case comprising a connection hole, input button, processors, memory and circuitry, and a wireless earbud configured for plugging into the connection hole of the charging base to form an integrated body with the charging case.

172.   For example, the Accused Products include circuitry configured to operate in combination with software instructions to perform specific functions, such as pairing, playing audio data received from a smartphone, performing wired data communication between the earbuds and base, and initiating charging of wireless earbuds, claimed in the '198 Patent.  Such hardware and software have no substantial non-infringing use.

173.   Apple's infringing conduct has been and continues to be willful, intentional, and carried out with actual knowledge of the '198 Patent.

174.   Since receiving notice of the '198 Patent, Apple has continued to perform acts of indirect infringement and has taken no steps to modify the Accused Products or instruct end users or customers how to use the Accused Products in a way to avoid infringement.

175.   As a result of Apple's past infringing conduct, Apple is liable to Pinn in an amount that adequately compensates it for Apple's infringement, which by law can

be no less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

176.   As a result of Apple's ongoing infringing conduct described in this Count, Pinn will continue to be damaged unless Apple is enjoined from further infringement.

## NOTICE OF REQUIREMENT OF LITIGATION HOLD

177.   Apple is hereby notified that it is legally obligated to locate, preserve, and maintain all records, notes, drawings, documents, data, communications, materials, electronic recordings, audio/video/photographic recordings, and digital files, including edited and unedited or "raw" source material, and other information and tangible things that Apple knows, or reasonably should know, may be relevant to actual or potential claims, counterclaims, defenses, and/or damages by any party or potential party in this lawsuit, whether created or residing in hard copy form or in the form of electronically stored information (hereafter, "Potential Evidence").  As used above, the phrase "electronically stored information" includes, without limitation: computer files (and file fragments), e-mail (both sent and received, whether internally or externally), information concerning e-mail (including but not limited to logs of e-mail history and usage, header information, and deleted but recoverable e-mails), text files (including drafts, revisions, and active or deleted word processing documents), instant messages, audio recordings and files, video footage and files, audio files, photographic footage and files, spreadsheets, databases, calendars, telephone logs, contact manager information, internet usage files, and all other information created, received, or maintained on any and all electronic and/or digital forms, sources and media, including, without limitation, any and all hard disks, removable media, peripheral computer or electronic storage devices, laptop computers, mobile phones, personal data assistant devices, Blackberry devices, iPhones, video cameras and still cameras, and any and all other locations where electronic data is stored. These sources may also include any personal electronic, digital, and storage devices of any and all

of Defendant's agents, resellers, or employees, if Defendant's electronically stored information resides there.

178.   Apple is hereby further notified and forewarned that any alteration, destruction, negligent loss, or unavailability, by act or omission, of any Potential Evidence may result in damages or a legal presumption by the Court and/or jury that the Potential Evidence is not favorable to Defendant's claims and/or defenses. To avoid such a result, Defendant's preservation duties include, but are not limited to, the requirement that Defendant immediately notify its agents and employees to halt and/or supervise the auto-delete functions of Defendant's electronic systems and refrain from deleting Potential Evidence, either manually or through a policy of periodic deletion.

## PRAYER FOR RELIEF

Pinn prays for the following relief:

(i)      Judgment that Apple has directly infringed the Patents in Suit;

(ii)     Judgment that Apple has indirectly infringed the Patents in Suit;

(iii)    Judgment that the Patents in Suit are valid and enforceable;

(iv)     An award of damages adequate to compensate Pinn for Apple's direct and indirect infringement up to and including the date such judgment is entered, to the full extent damages are available under 35 U.S.C. §§ 154(d), 284, or otherwise, along with prejudgment and post-judgment interest at the highest allowable rates;

(v)      An award of enhanced and/or treble damages, pursuant to 35 U.S.C. § 284;

(vi)     Judgment that this case is exceptional, along with a corresponding award of reasonable attorney fees, pursuant to 35 U.S.C. § 285;

(vii)    Costs and disbursements, pursuant to Fed. R. Civ. P. 54(d), 28 U.S.C. § 1920, 35 U.S.C. § 284, or otherwise;

(viii)   An accounting;

(ix)     A permanent injunction, or, alternatively (if the Court declines to grant

injunctive relief), and to the extent calculable, damages adequate to compensate Pinn for Apple's ongoing or future infringement; and

(x)    Such other and further relief, whether at law or in equity, as the Court deems just and proper.

# DEMAND FOR JURY TRIAL

Pinn demands trial by jury for all issues so triable, pursuant to Fed. R. Civ. P. 38(b) and Civil L.R. 3-6(a).

April 17, 2020

By  /s/  Cabrach Connor

Ryan E. Hatch
California Bar No. 235577
ryan@ryanehatch.com
**LAW OFFICE OF RYAN E. HATCH, P.C.**
13323 Washington Blvd., Suite 100
Los Angeles, CA 90066
Telephone: 310-279-5076

David A. Skeels (*admitted pro hac vice*)
Texas Bar No. 24041925
dskeels@whitakerchalk.com
Enrique Sanchez, Jr. (*admitted pro hac vice*)
Texas Bar No. 24068961
**WHITAKER CHALK SWINDLE & SCHWARTZ PLLC**
301 Commerce Street, Suite 3500
Fort Worth, Texas 76102
Telephone: (817) 878-0500
Facsimile: (817) 878-0501

Cabrach J. Connor (*admitted pro hac vice*)
Texas Bar No. 24036390
cab@connorkudlaclee.com
Jennifer Tatum Lee (*admitted pro hac vice*)
Texas Bar No. 24046950
jennifer@connorkudlaclee.com
Kevin S. Kudlac (*admitted pro hac vice*)
Texas Bar No. 00790089
kevin@connorkudlaclee.com
**CONNOR KUDLAC LEE PLLC**
609 Castle Ridge Road, Suite 450
Austin, Texas 78746
Telephone:  (512) 777-1254
Facsimile:  (888) 387-1134

*Attorneys for Pinn, Inc.*